# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 17, 2018 Session

## STATE OF TENNESSEE v. DOUGLAS MCARTHUR WILSON

**Appeal from the Criminal Court for Smith County**
**No. 2012-CR-250   Brody N. Kane, Judge**

FILED

MAY 0 7 2018

Clerk of the Appellate Courts
Rec'd By _____

**No. M2017-00432-CCA-R3-CD**

Defendant, Douglas McArthur Wilson, was indicted for attempted first degree murder in 2012. After a jury trial, Defendant was convicted of the lesser included offense of attempted second degree murder. The trial court sentenced Defendant to ten years in incarceration. After the denial of a motion for new trial, Defendant presents a multitude of issues on appeal. After a thorough review of the record and applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, Jr., J., joined.

Jacky O. Bellar, Jamie D. Winkler, and Samantha L. Key, Carthage, Tennessee, for the appellant, Douglas McArthur Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Tom P. Thompson, District Attorney General; and Jack Bare and Javin Cripps, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural Background*

On the evening of September 23, 2012, emergency medical personnel were summoned to a home in rural Smith County based on a report of a stabbing or cutting.

Upon their arrival, they found Timothy Bennett, the victim, at the home of Judith Brown. He was bleeding profusely from a large gash in his neck that extended nearly from one side of his neck to the other. The victim was transported via helicopter to Vanderbilt Hospital in Nashville for treatment. He survived. Defendant was arrested and transported to the police station that night. The next morning, Defendant was read his *Miranda* rights and questioned by police. The interview room was equipped with video recording equipment, which recorded the interaction between Defendant and the police. As a result, Defendant was eventually indicted by the Smith County Grand Jury for one count of attempted first degree murder.

## *I. Hearing on Motion to Suppress*

In March of 2013, Defendant filed a motion to suppress the statement given to police the day after the incident. The trial court held a hearing on the motion on April 8, 2013.[1] At the hearing, the trial court heard testimony from Shannon Hunt, a Lieutenant with the Detective division of the Smith County Sheriff's Department. Lieutenant Hunt was on call the night of the incident and responded to the scene from his residence. When Lieutenant Hunt arrived on the scene, the victim was already being transported by helicopter to Nashville and Defendant was in custody in the back of a patrol car.

Lieutenant Hunt attempted to talk to Defendant when he arrived on the scene but Defendant was "heavily intoxicated on alcohol or pills" and "could barely stand". Defendant's family informed the officer that Defendant was on medication, but the officer was not certain how many pills Defendant had taken or what kind of pills Defendant had taken. Lieutenant Hunt "didn't think it would be fair . . . to talk to him at that time," so he made the decision to postpone the interview of Defendant to a later time. Defendant was transported to and held at the Smith County Sheriff's Department.

At approximately 9:12 a.m. the next morning, Lieutenant Hunt assessed Defendant's condition and believed that Defendant "didn't appear intoxicated." In fact, Lieutenant Hunt explained that "[i]f [Defendant] had something left over in his system at the time [he] talked to [Defendant] that morning, it didn't appear." Lieutenant Hunt believed that Defendant "understood" his rights and what was going on that morning. During questioning by Lieutenant Hunt, Defendant "explained the prior night in detail."

Defendant testified at the suppression hearing. He explained that at the time of his arrest, he was taking allergy medicine, antibiotics, an anti-inflammatory, and Xanax. Defendant insisted that "three or four days" prior to the incident, he had refilled a

---

[1] At the hearing in April of 2013, the trial judge was the honorable David E. Durham. Judge Durham retired prior to the trial in this matter.

prescription for "ninety of the Xanax." Defendant explained on the night of September 23, he drank eight beers and took "all" of the Xanax, which would have amounted to approximately eighty pills. Defendant claimed that he was taken to the jail and placed "in a cell with not even a bathroom." Defendant claimed that he was not taken to the hospital, and that he did not "remember [the interview] at all."

The trial court reviewed the videotaped interview and issued an oral ruling denying the motion to suppress.[2] In the ruling, the trial court noted that Defendant was clearly "in custody" at the time of the interview. The officers present during the interview "fully advised" Defendant of his *Miranda* rights. The trial court noted that Defendant "clearly did not sign a waiver" but that Defendant was "very cooperative, never refused to answer [any] questions, [gave] no indication at all that he didn't want to talk or tell his side of the story, and at no time did he ever ask for a lawyer even though he was advised of that particular right." The trial court noted Defendant's "cooperative," "spontaneous" answers to questions, and determined that Defendant knowingly and voluntarily waived his rights. The trial court observed that Defendant never requested a lawyer and that the statements were voluntary.

In September of 2014, for reasons unclear to this Court, Defendant filed a second motion to suppress the statement. The second motion to suppress raised basically the same issues as the first motion to suppress. The record contains neither a transcript from a hearing on this motion nor an order disposing of this motion. However, at trial, defense counsel renewed the motion during the testimony of Lieutenant Hunt when the State attempted to introduce the videotape of the interview. At that time, the trial court upheld "the ruling [the original trial judge] previously made [on the motion to suppress]."

## II. Trial Testimony

The victim was twenty-two years old at the time of the incident. He explained that there were three houses on a "family compound" down the gravel road where the incident occurred. The first house belonged to Ruth Bedgood, Defendant's mother-in-law. Defendant's house was in the center. Defendant lived at the house with his stepson, Kate Cortez, Jr.; Mr. Cortez's girlfriend; and Deborah Wilson, Defendant's wife. Mrs. Wilson was the sister of Judith Brown, whose house was the last house on the road. The victim was unemployed and lived with Judith Brown. Several other people lived at the Brown residence, including Stetson Brown, Erica Brown, Larry Stump, and Trisha Brown. The victim had been living there a few months and was "acquainted" with Defendant; he explained that they did not have "much of a relationship" but had not had any conflicts.

---

[2] There is no order disposing of the motion to suppress in the technical record on appeal.

The victim helped Defendant split wood on several occasions. The victim had a blue "mohawk" at the time of the incident.

In the early evening of the incident, the victim was "getting wood" for a bonfire for Erica Brown's birthday. The victim had a "couple of beers" around 7:00 p.m. Stetson Brown helped the victim get the fire started. The victim admitted that he had "used drugs" in the past but denied taking any medication or drugs the night of the incident other than drinking a few beers. That night, the victim planned to "have a good time" and "hang out" by the bonfire.

The victim recalled that he was "sitting on a rock" by the bonfire. He had a machete with him that night that he "used to cut stuff up for the bonfire." Apparently, the victim routinely carried a machete around with him. The victim described the machete as a "regular store bought machete" about "two feet long" that he bought at Walmart a few weeks prior to the incident. According to the victim the machete was about forty to fifty feet away from where he was sitting.

After the fire was started, several of the people left to go to the store to get more alcohol. The victim was sitting at the fire drinking a beer, "waiting on [his] friends to come back with some drinks, and [Defendant] just come up behind and slit - - cut [his] throat." The victim testified that Defendant got him in a "choke hold, like [he] was going to be in [a] headlock." Then, the victim "felt something warm and wet go down [his] chest and . . . noticed it was blood." The victim claimed that there was no verbal exchange between him and Defendant prior to the attack.

Judith Brown was inside her house at the time of the incident. When she came outside during the bonfire she "saw [the victim and Defendant] brawling," or what she thought was "brawling," because it looked like Defendant "was kind of on top of [the victim]." She ran outside and grabbed Defendant and asked him "what's going on." The victim was able to recall that Judith Brown removed Defendant from the victim. Judith Brown saw Defendant run around to the back of the house. Judith Brown admitted that she and the victim were drinking that night and even described herself as "drunk."

After Judith Brown separated the two men, the victim ran into the house, thinking that he was "going to die." The victim collapsed when he got inside. The next thing the victim recalled was being placed on a stretcher. At trial, the victim showed his scar, which extended from behind his right ear all the way around his neck, stopping under his chin on the left side of his neck. He complained that he still had no feeling in half of his face as a result of the injuries.

The victim identified a knife from the area surrounding the bonfire as a knife that he saw "[p]robably a few days before the incident" at Defendant's house. The victim denied Defendant's allegations that he was throwing cans out of a car trying to hit people.

On cross-examination, the victim denied that he attempted suicide four days prior to the incident and denied that he reported to medical personnel a day or two after the incident that he had "seven different personalities" including "an Irish guy, a gay guy, two guys you don't want to mess with, a little kid" and other personalities that he could not recall. In fact, the victim denied "seeing a psychologist or psychiatrist." The victim admitted that he did not remember taking pain medication the day of the incident but that it was possible that he took pain medication. When questioned, the victim agreed that he was a peaceful person. The victim did not recall Defendant telling emergency medical personnel that the incident occurred because Defendant thought the victim was flirting with his wife. The victim also did not recall Defendant touching him prior to the attack.

John Wesley Hiett with the Smith County Emergency Medical Services ("EMS") was one of the first responders on the scene. He found the victim inside Judith Brown's home lying on his "right side holding [a piece of cloth or towel to] his throat." There was a "large amount of blood on the floor." With the help of one of the police officers on the scene, Mr. Hiett was able to place a spine board under the victim and roll him to his back. When the towel was removed from the victim's neck a "very large laceration [was visible]," which spanned from "jawline to jawline." The victim was obviously in shock but was otherwise awake and alert. Mr. Hiett and several other officers had to drag the victim to the door of the house before carrying him outside to be placed on a stretcher. Mr. Hiett described the victim as a "large" man. The victim was taken by ambulance to a helicopter for transport to Vanderbilt hospital.

Sergeant Dusty Hailey was dispatched to the scene upon a report of an "altercation involving a knife." When he received the call, he notified EMS and took two deputies with him. Sergeant Hailey arrived at Judith Brown's house where he found the victim on the floor in "a very large pool of blood." The victim identified Defendant as the perpetrator.

Sergeant Hailey assisted Lieutenant Shannon Hunt and Kit Jenkins in processing the scene. Sergeant Hailey located a knife next to the fire pit. He also collected the victim's bloody clothing from the hospital. Sergeant Hailey placed the clothing in a paper bag and took the clothing to his office to dry before it was sent to the Tennessee Bureau of Investigation ("TBI") for processing.

Detective Jenkins helped to process the crime scene by taking photographs and collecting evidence. Blood was found near the fire pit and a trail of blood led to the

house. A knife was found near the fire pit. The blood on the knife matched the victim. The handle of the knife contained DNA from three individuals, with the major contributor profile being a mixture of the victim's DNA and an unknown male. The unknown male DNA matched the DNA profile obtained from a blue sweatshirt belonging to Defendant.

After the victim was transported from the scene, Defendant emerged from the woods. He was taken into custody and transported to the police station but was not questioned because he appeared to be heavily intoxicated. The next morning, Defendant was questioned by Lieutenant Hunt and Detective Jenkins. Defendant did not appear impaired at that point and spoke freely to the officers. At trial, Defendant renewed his motion to suppress the videotape of the interview. The trial court upheld the prior ruling denying the motion to suppress.

The videotape of the interview was played for the jury. During the videotape, Defendant is asked if he knows why he is in jail. Defendant responds that he "cut a fat piece of shit." Defendant then informed the officers that his stepson told him that the victim was throwing bottles and cans out of a car at old people. This made Defendant "angry," so he decided to "teach [the victim] a lesson."

Defendant testified at trial. Defendant was forty-nine years old at the time of trial. He suffered from a heart murmur, arthritis, and knee pain. Defendant had one "artificial knee." Defendant explained that he was unemployed at the time of the incident but held a regular job at the time of trial. Defendant also often worked in the neighborhood farming and cutting wood. Defendant recalled a time prior to the incident when the victim asked to help cut wood. Defendant taught the victim to "split wood" and described the victim as "excited" to learn this skill. On one particular occasion, the victim got overheated while they were working together so Defendant gave him a glass of water. Defendant continued to work and, after a few minutes, "looked around" and did not see the victim. Defendant found the victim inside his house "sitting against" Defendant's wife, who was "laid out" on "pain medication" because she had a broken leg. Defendant asked the victim to get up. The victim got up and sat down next to Mr. Cortez's girlfriend. Defendant asked the victim to go outside.

On the night of the incident, Defendant described it as a "normal night." He knew that the neighbors were going to have a bonfire. Around 8:00 or 8:30 p.m. that night, he got a call from Erica Brown asking for help in lighting the bonfire. Defendant walked next door and saw the victim sitting in front of the fire. The victim had cut his hair into a mohawk and dyed it blue. Defendant thought it was "kind of funny," so he "played with [the victim's] hair." According to Defendant, everyone was having a good time, laughing and enjoying the evening. Defendant noticed "a lot of beer cans and a lot of drinking

going on" and that a few of the people were underage. He made the underage people go inside the house. Defendant turned around and saw the victim laughing. The victim asked Defendant "what?" Defendant told him he "shouldn't be going around and throwing trash out of there because in our neighborhood it's a small community." At this point, Defendant claimed the victim "got mad and stood up." Defendant did not know if the victim was kidding or not so Defendant "reached up" and "pinched his chest" and "took a step back." The victim "grabbed" a machete that was "sticking out of the ground" and came toward Defendant. At that point, Defendant grabbed for the machete because he thought the victim "was going to cut [him] with it." Defendant recognized it as the victim's machete. Defendant "tackled" the victim and claims that he did not "know what happened in the struggle." He recalled being pulled off of the victim and being hollered at to stop. As Defendant left, the victim was facing the other way. The victim turned around and yelled that he was "sorry" for touching Defendant's wife. Defendant saw the victim "run around the house" to the front door. Defendant went home. When he got there he discovered that he had blood on his hand. He was "overwhelmed" because he had lost his job "because of his knees," he had bills, his wife had a broken leg, and he thought that he hurt the victim. Defendant grabbed his jacket and his "pill bottles" and ran to the barn. By the time he got to the barn there was an ambulance arriving on the property. Defendant took the "entire bottle of Xanax" before surrendering to police. Defendant did not recall giving a statement to police and could not recall "parts" of "the hearing" [police interview].

At the conclusion of the jury trial, Defendant was found guilty of the lesser included offense of attempted second degree murder and, after a sentencing hearing, was sentenced to ten years' incarceration. Defendant filed a motion for new trial, in which he memorialized multiple complaints about his trial. The trial court held a hearing on the motion, at which Defendant presented the testimony of several witnesses. The trial court denied the motion after the hearing. Defendant filed a timely notice of appeal.

On appeal, Defendant raises the following issues for our review: (1) whether the trial court improperly denied the motion to suppress; (2) whether the trial court erred in admitting clothing and a weapon into evidence where the State failed to establish chain of custody; (3) whether the trial court improperly excluded the victim's Facebook posts; (4) whether the trial court improperly excluded medical records of the victim; (5) whether the trial court erred in admitting the videotape of Defendant's statement; (6) whether the trial court erred by permitting the jury to view the videotape multiple times; (7) whether the trial court properly instructed the jury with respect to the videotape; (8) whether the trial court erred by refusing to grant a mistrial after the videotape malfunctioned; (9) whether the trial court erred by restricting Defendant's examination of witnesses; (10) whether the evidence was sufficient to support the verdict; (11) whether the trial court erred in denying a mistrial after improper jury conduct; (12) whether newly discovered

evidence warrants a new trial; (13) whether the trial court improperly denied the motion for judgment of acquittal; (14) whether court personnel influenced the verdict; (15) whether the trial court improperly instructed the jury on flight; and (16) whether the sentence was excessive.

*Analysis*

*I. Denial of the Motion to Suppress*

Defendant argues that the trial court erred in denying the motion to suppress his statement. Defendant insists that he has "no recollection" of the interview or waiver of rights due to his high level of intoxication and, therefore, the trial court should have granted the motion to suppress. The State, on the other hand, argues that there is "no merit" to Defendant's claim.

In reviewing a trial court's ruling on a motion to suppress, this Court will uphold the trial court's findings of fact "unless the evidence preponderates otherwise." *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014) (citing *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013)). Witness credibility, the weight and value of the proof, and the resolution of conflicts in the proof "are matters entrusted to the trial court as the trier of fact." *Id.* at 529. "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court's resolution of questions of law and application of the law to the facts are reviewed de novo with no presumption of correctness. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). On appeal, the losing party bears the burden of demonstrating that a trial court's decision concerning a motion to suppress was erroneous. *State v. Harts*, 7 S.W.3d 78, 84 (Tenn. Crim. App. 1999). "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the state and federal constitutions guarantee an accused the right to the assistance of counsel and the right against self-incrimination. The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the

- 8 -

accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *See Gideon v. Wainwright*, 372 U.S. 335, 339 (1963) (holding that Sixth Amendment right to counsel in criminal proceedings applies to states through Fourteenth Amendment). Similarly, Article I, section 9 of the Tennessee Constitution provides: "That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel." Tennessee courts have consistently interpreted the right to counsel under Article I, section 9 of the Tennessee Constitution as identical to the Sixth Amendment right to counsel. *See State v. Willis*, 496 S.W.3d 653, 702-03 (Tenn. 2016), *cert. denied*, 137 S. Ct. 1224 (2017).

Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and to remain silent may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). The voluntariness of a confession "remains distinct from *Miranda*." *Climer*, 400 S.W.3d at 568 (citing *Dickerson*, 530 U.S. at 434-35). In order to determine the voluntariness of a statement, a court must "examine the totality of the circumstances surrounding the giving of a confession, 'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434)); *see also Monts v. State*, 400 S.W.2d 722, 733 (Tenn. 1966). Factors relevant to this determination include:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)); *see State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (recognizing that no single factor is necessarily determinative). With respect to a defendant's impairment, "intoxication does not render a confession invalid if the evidence shows that the defendant was capable of understanding and waiving his rights." *State v. James David*

- 9 -

*Johnson*, No. W2006-01842-CCA-R3-CD, 2008 WL 540505, at *5 (Tenn. Crim. App. Feb. 6, 2008) (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)), *no perm. app. filed*; *see also State v. Anthony Porrazzo*, No. E2014-02335-CCA-R3-CD, 2015 WL 9259996, at *5-6 (Tenn. Crim. App. Aug. 18, 2015), *perm. app. denied* (Tenn. May 5, 2016).

In this case, the record does not support Defendant's claim that his statement was involuntarily given. We have reviewed the videotape of the statement. Defendant, who attended high school until the tenth grade, was provided with *Miranda* warnings and orally waived his rights. He expressed familiarity with *Miranda* based on his prior interaction with authorities. Defendant was not sick or injured during his interview. There is no evidence that Defendant was abused or deprived of food or sleep prior to or during the relatively short interview. Although Defendant claimed to be heavily intoxicated because he was under the influence of "a bottle" of Xanax, his demeanor and speech belied that contention. Defendant coherently answered the questions. Though not Shakespearean, Defendant was polite and able to provide fairly detailed descriptions of his actions that evening. In fact, officers recognized Defendant was intoxicated when he was arrested and waited until around 9:00 a.m. the next morning to initiate the interview. In our view, the circumstances surrounding the statement support the trial court's determination that Defendant knowingly and voluntarily waived his rights. Defendant is not entitled to relief on this issue.

## II. Introduction of Clothing and Weapon into Evidence

Defendant challenges the trial court's refusal to exclude the physical evidence, namely his clothing and the alleged weapon, on the basis that the chain of custody was not properly established by the State. Moreover, Defendant claims that "no reliable DNA evidence linked the alleged weapon to Defendant" and that the State should not have been permitted to ask Defendant about the DNA evidence on cross-examination. The State disagrees, pointing to the testimony of TBI Agent Charly Castelbuono to substantiate the chain of custody. The State also argues that Defendant was not asked to testify about DNA evidence, rather he was asked by the State if he was "surprised" to hear that the blood on a sweatshirt seized from Defendant matched the blood on the handle of the knife.

Though not acknowledged by either party, Defendant did not object to the chain of custody at trial and, thus, has waived the issue on appeal. *See* Tenn. R .App. P 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission

- 10 -

of evidence). Thus, Defendant is only entitled to relief if he can establish plain error. The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

*State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id.* at 231.

As we have previously recognized, it is "'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting *State v. Holbrooks*, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998)); *see also* Tenn. R. Evid. 901. This evidentiary rule is designed to insure "'that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering. *Scott*, 33 S.W.3d at 760. The State is not required to call every single person who handled the item prior to its admission as evidence. *See State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). "Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008). However, if the State does not offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Neil P. Cohen et. al., *Tennessee Law of Evidence* § 901.12, at 624 (3d ed. 1995)).

Defendant insists that the chain of custody was not properly established with regard to the knife and the sweatshirt because the items were sent to the TBI for analysis on multiple occasions and Agent Castelbuono was only in contact with the evidence on one of those occasions. In fact, she admitted she had no idea where the evidence had

been or who had come in contact with it prior to her testing. At trial, Agent Castelbuono testified that the items were submitted for serology testing by another person in the lab at the TBI before being sent back to the sheriff's office. The items were ultimately returned to her lab at the TBI for DNA testing, a procedure she claimed was not unusual. Both the witnesses from the sheriff's office and the witness from the TBI testified as to the chain of custody procedures they typically followed. None of the witnesses expressed any inconsistency with their operating procedure with regard to the evidence at issue. Consequently, Defendant has not shown that the trial court breached a clear and unequivocal rule of law by admitting the evidence. The testimony provided by the State was more than enough to "reasonably establish the identity and integrity of the evidence." *Cannon*, 254 S.W.3d at 296. Defendant is not entitled to plain error review of this issue.

As to Defendant's companion argument that he was improperly cross-examined about information in the DNA report when he was asked if he "was surprised to hear that blood or hemoglobin found on the sweatshirt that was taken from [him] and the t-shirt taken from [him] at the jail matched one blood or hemoglobin stain found on the handle of the knife," we determine that there was no abuse of discretion. Defendant was not, as he contends, being asked to testify as an expert. To the contrary, Defendant was being cross-examined by counsel for the State. The propriety, scope, manner, and control of the cross-examination of witnesses rests within the sound discretion of the trial court. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). The trial court did not abuse its discretion in overruling Defendant's objection to the State's cross-examination. Defendant is not entitled to relief on this issue.

*III. Facebook Posts by Victim*

Defendant complains that the trial court erred in excluding Facebook posts from the victim's Facebook page for impeachment purposes, preventing him from presenting a complete defense. The State disagrees.

At trial, during cross-examination, counsel for Defendant asked the victim, "[d]o you consider yourself a peaceful person?" The victim agreed that he considered himself to be a peaceful person. Counsel for Defendant then asked the victim if he was a peaceful person in 2012, on the specific date of the incident, in 2013, and in 2014. The victim replied "yes" that he considered himself a peaceful person at all of those times. The State objected "on the basis of relevance." Counsel for Defendant explained that Defendant "opened the door" to introduction of Facebook posts that "show just the opposite of [peacefulness]." The State commented that the Facebook posts are "absolutely not relevant." Counsel for Defendant informed the trial court that he is entitled to "impeach [the victim]. . . if he says he's a peaceful person." Counsel for Defendant reminded the trial court that they are "seeking self-defense" so the victim's

- 12 -

role as aggressor was "entirely relevant," and asked the trial court to "admit" the posts or have the victim identify them. The State argued that "what [the victim's] posted in the years since this is absolutely not relevant." Counsel for Defendant countered that the victim claimed "he was peaceful before and he's the same as he was then . . . so [w]hat he has done after is absolutely relevant to his state of mind and where he has been consistent throughtout the years."

The State requested a jury-out hearing, again insisting that the Facebook posts were "not relevant at all." The trial court had a jury-out hearing during which counsel for Defendant moved to introduce Facebook posts from the victim's personal Facebook page. Defendant argued that the posts were "relevant for a couple of different reasons." Counsel for Defendant argued the posts were relevant to "impeach" the victim, and questioned the victim's credibility. The State continued to maintain that nothing the victim posted after the incident was relevant.

The trial court excluded the Facebook posts as irrelevant but accepted an offer of proof. Defendant introduced various Facebook posts from an account that the victim confirmed belonged to him at the time of the incident. The Facebook posts consist mainly of memes[3] dealing with death, murder, and violence. For example, one post consists of a picture of a white kitten with the caption, "the voices are telling me to kill you," while another post consists of a picture of "Grumpy Cat"[4] with the caption "twinkle[,] twinkle little star[,] I want to hit you with a car[,] throw you off a tree so high[,] hope you break your neck and die." The victim acknowledged that he posted these items on his Facebook "wall."

At the conclusion of the offer of proof, Counsel for Defendant argued that the whole collection of posts should be admitted and in the least, the posts "posted prior to this incident" should be admitted. The State continued to maintain that the posts were not relevant. The trial court determined that they were "not relevant."

In the written order denying the motion for new trial, the trial court commented that the Facebook posts were "not relevant." The trial court also commented that even "[t]hough some may view some or all of the posts as strange or odd, the posts would not tend to make the events . . . more or less probable than without the [posts]."

---

[3] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." https://www.merriam-webster.com/dictionary/meme (last visited February 21, 2018).

[4] "Grumpy Cat" is an actual cat with a perpetually grumpy looking face. The cat became an internet sensation in 2012 and is depicted in numerous memes and official merchandise. https://www.grumpycats.com/ (last visited February 21, 2018).

Additionally, the trial court noted that "the Facebook posts, in and of themselves [were] not 'violent' as argued by the defense, but merely photographs or jokes the victim chose to post on his Facebook account in the years before and after the night the victim's throat was slashed." Finally, the trial court determined that if the posts were at all relevant, any relevance would have been outweighed by "the danger of unfair prejudice."

On appeal, Defendant argues that the Facebook posts were admissible to "impeach" the victim pursuant to Tennessee Rule of Evidence 404. The State continues to maintain that the evidence was not relevant. Rule 404 applies to situation to rebut proof with substantive evidence. At trial, Defendant asserted that the Facebook posts were admissible to impeach the victim's credibility—which is not substantive evidence and is governed by Tennessee Rule of Evidence 608. Even if the questions about the victim's Facebook posts are relevant, Rule 608(b) prohibits using extrinsic evidence to prove specific instances of conduct. Defendant consistently argued at trial that the Facebook posts were relevant to impeach the victim's claim that he was a peaceful person, not to show that he was the first aggressor. Defendant is not permitted to rely upon a different theory for the admission of evidence than that asserted in the trial court. *See e.g., State v. Garland*, 617 S.W.2d 176, 186 (Tenn. Crim. App. 1981); Tenn. R. App. P. 36(a) (explaining that "relief may not be granted in contravention of the province of the trier of fact."). Thus, Defendant is limited on appeal to challenging the trial court's determination that the evidence was not relevant. Evidence must be relevant to be admissible. Tenn. R. Evid. 402. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. We agree with the trial court that questions concerning the victim's Facebook posts were not relevant to impeach the victim's testimony of his peacefulness. While the posts may indicate that the victim has an unusual or even questionable sense of humor, we decline to see the relevance to the victim's credibility. The trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

### IV. Introduction of Medical Records

Defendant argues on appeal that the trial court improperly excluded the victim's medical records when Defendant sought to use the records to impeach the victim's testimony under Tennessee Rules of Evidence 608(b) and 609. Defendant also argues that the trial court limited and restricted his direct and cross-examination of the victim at trial, preventing him from presenting a complete defense. Defendant points to specific limitations placed on his ability to question the victim about his drug use and medical records, among other things. The State counters that Defendant was permitted to question the victim about his past drug use and psychiatric treatment without the

introduction of the medical records, and that Rule 608(b) prohibits proof of specific incidents of conduct by extrinsic evidence.

At trial, the victim admitted that he drank a few beers on the day of the incident. On cross-examination, the victim denied using drugs that day. However, he admitted that he had "used drugs" in the past. Defendant then was allowed to impeach the victim by asking him about his use of specific drugs. Counsel for Defendant specifically asked if the victim had used the following drugs: marijuana, cocaine, methamphetamine, heroin, LSD, PCP, acid, mushrooms, Soma, Hydrocodone, Lortabs, Oxycodone, Xanax, or alcohol. Counsel for Defendant next asked the victim if he had attempted suicide four days prior to the incident and about other details of his psychiatric treatment. The victim denied or could not recall making any statements attributed to him in the medical report. In return, counsel quoted from several passages from the victim's medical records indicating that the victim had attempted suicide days prior to the incident and was regularly abusing drugs.

Tennessee Rule of Evidence 608 provides for impeachment of a witness with specific instances of conduct "for the purpose of attacking or supporting the witness's character for truthfulness." The rule specifically provides that specific instances of conduct "may not be proved by extrinsic evidence" but, "if probative of truthfulness or untruthfulness and under the following conditions, [may] be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness." *Id.*

Despite the rule's prohibition of extrinsic evidence to prove specific instances of conduct, Defendant nevertheless argues that the trial court improperly excluded the medical records of the victim. The trial court has discretion to admit evidence at trial. *Robinson*, 146 S.W.3d at 490. The trial court herein properly followed Rule 608(b), declining to permit introduction of the medical records. Defendant was, however, permitted to cross-examine the victim about his statements to medical professionals. In so doing, counsel for Defendant actually read from the medical records, essentially getting the records into evidence without their admission as an exhibit. Moreover, the medical report was later admitted into evidence during the testimony of a police witness as a statement for the purpose of medical diagnosis and treatment as well as evidence of a prior inconsistent statement. *See* Tenn. R. Evid. 613(b), 803(4), 803(6). At that point, the jury was free to examine the medical records and note any inconsistencies with the victim's testimony. Lastly, to the extent that Defendant claims his cross-examination of the victim was somehow unfairly restricted, the record does not support his claim. Defendant sought to ask the victim whether he had thoughts about hurting Defendant after the incident. We fail to see how this question is relevant to whether Defendant

committed the crime for which he was on trial. Defendant has failed to establish that the trial court abused its discretion. Defendant is not entitled to relief on this issue.

## V. Videotaped Statement

### A. Introduction of Malfunctioning Videotape

Defendant claims that the videotape of Defendant's statement malfunctioned during trial in that the video and audio portions of the tape were "off by a substantial amount of time." This was, in his viewpoint, unfairly prejudicial under Tennessee Rule of Evidence 403. Defense counsel requested that the videotape be excluded after it was shown to the jury and malfunctioned. The trial court denied the request and the subsequent request for a mistrial, instead instructing the jury specifically on how to treat the videotape as evidence before allowing the jury to view the videotape multiple times in the jury room.

The jury was excused while the parties discussed the issues. When the jury returned, the trial court commented:

> As you can see, as the video was being played there was a discrepancy between the video that you saw and the sound that you heard. You will receive an instruction at the end of this case about observing the demeanor of the witnesses and that sort of thing. It is problematic as far as what you were observing that Defendant doing or [Lieutenant] Hunt doing as the questioning was going on.
>
> It was not what was occurring - did not keep in time with what was being said, and it's my understanding that from the beginning that's been the case. So you'll just have to keep that in mind as you go through your deliberations. I'm going to go ahead and we're going to continue to play the - I think there's just a little bit left of the audio. We're not going to look at the video at this time.

During a jury-out hearing, the trial court ruled that the recording was properly authenticated and admitted as an exhibit. The trial court stated the following during the hearing:

> A technical glitch resulted in the audio and video not being in sync with each other unbeknownst to those watching until close to the conclusion of the recording.

The two detectives and Defendant began to exit the interview room while the audio portion continued. It's a matter of a few seconds difference. Defense counsel has expressed concern about as far as observing the demeanor of Defendant during the questioning based on it being – his demeanor may be in response to a different question than what may have been intended based on viewing the video.

I'm going to keep the video as it is. It's certainly going to be able to go back with the jury at the conclusion of the trial. This exhibit like any other can be reviewed and watched by them as many times as they like. Should they go back and deliberate and want to see the video, then they'll come back in to the courtroom. I'm going to assign either [the in-court clerk] or someone else that's independent that can operate this equipment will be available to let them watch that as many times as they want.

[The in-court clerk] will be instructed not to discuss it with any other person the deliberations or anything like that sort that he might hear during the video should they choose to watch it. Unfortunately, again, there was a glitch there, but I don't think there's going to be any prejudice to the Defendant based on this.

I will also give an instruction when they come back just kind of touching base on – I'm going to use the Defendant's statement instruction just to kind of show them at this time it's basically their call how much weight to give it based on what they heard, what they could hear based on this recording. So that's my ruling with respect to that issue.

Again, relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, it may be inadmissible. Tenn. R. Evid. 403. In this case, however, the trial court determined that the evidence was more probative than prejudicial. We agree. The tape, even if "out of sync" for a few seconds, accurately represented the interview with Defendant and did not delete any words/phrases or images. The trial court did not abuse its discretion in admitting the videotape.

### B. Jury Instruction Related to Tape Insufficient to Cure Error

Defendant, citing only Defendant's "constitutional right to a correct and complete charge of the law" also complains about the trial court's curative jury instruction,

insisting that it was not sufficient to overcome the prejudice suffered by Defendant. The State disagrees.

At trial, after the trial court determined that the videotaped statement was admissible, the trial court informed the jury that they were going to receive an instruction regarding the videotaped statement immediately prior to viewing the videotape and at the conclusion of the proof prior to deliberations. The trial court instructed the jury that the statement was ruled admissible, but reminded the jury that they were charged with "judg[ing] its truth." The trial court commented to the jury:

> You must consider all the statements made by Defendant, whether favorable or unfavorable to him, and you must not disregard any of them without good reason. . . .

> You are the sole judges of what weight should be given to those portions of the statement which you believe, and you should consider them along with all other evidence in the case in determining . . . guilt or innocence.

> [Y]ou'll get a copy of all exhibits. This disk will go back . . . and you'll have a chance to . . . watch this video again. . . .

> It will be made available to you. If you would like, once you go back to deliberate, to watch that video, we'll bring you back. We'll clear the courtroom, other than [the in-court officer], and he'll play it for you and you can watch it to your heart's content. . . .

At the conclusion of the proof, the trial court again instructed the jury as follows:

Evidence of a statement by the Defendant has been introduced in this case.

. . . .

> The court has ruled that the statement is admissible in evidence, but it is your duty to judge its truth. In so judging, you should consider the circumstances under which the statement was obtained as well as any evidence which contradicts all or part of the statements made. You must consider all the statements made by the Defendant whether favorable or unfavorable to him, and you must not disregard any of them without good reason. If the evidence in the case leads you to believe that the statement or

any part of it is untrue or was never made, you should disregard it or that portion which you do not believe.

You are the sole judge of what weight should be given to those portions of the statement which you believe, and you should consider them along with all other evidence in the case in determining the Defendant's guilt or innocence.

A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A trial court commits prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this Court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998). Because the resolution of issues regarding jury instructions is a mixed question of law and fact, the standard of review is de novo, with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

We conclude that the trial court's instruction adequately addressed the sound/picture anomaly on the videotape. We have viewed the videotape multiple times with no issues. However, despite our inability to replicate the anomaly that apparently occurred at trial, we acknowledge that the trial court instructed the jury to independently judge the credibility of the statement. The jury is presumed to follow the trial court's instructions. *State v. Walker*, 910 S.W.2d 381, 397 (Tenn. 1995). Defendant is entitled to a fair trial, not a perfect one. *State v. Davidson*, 509 S.W.3d 156, 193 (Tenn. 2016) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *State v. Hutchison*, 482 S.W.3d 893, 921 (Tenn. 2016)). The trial court's instruction was adequate to address any anomaly on the videotape. Defendant is not entitled to relief on this issue.

### C. Error in Permitting Tape to be Shown Multiple Times

Without citing to authority to support his proposition, Defendant argues that the trial court erred by allowing the jury to view the videotaped statement multiple times. He

claims this practice was prejudicial, especially in light of the fact that court personnel were inside the room during deliberations while the videotape was shown multiple times.

When the jury retired to deliberate, they immediately asked to watch the videotape. The in-court officer, Deputy Evan Davenport, was charged with the operation of the playback equipment. Deputy Davenport testified at the hearing on the motion for new trial that he played the videotape approximately ten times while jurors watched in groups of three or four. About half of the time, the videotape malfunctioned so that the audio and video portions were not in sync with each other. The jury foreman, Tony Collins, explained that all of the jury wanted to re-watch the video because it was a key piece of evidence. Additional jurors Martha Holliday and Janice Miller complained that the jury needed to watch the videotape several times because it was difficult to hear during trial.

Defendant has waived this issue for failure to cite authority to support his proposition. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Moreover, Defendant would not be entitled to relief. Tennessee Rule of Criminal Procedure 30.1 provides that "[u]nless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." We have already determined that the trial court properly admitted the videotaped statement into evidence. Further, Defendant did not object to this procedure at the time of the viewing of the videotape by the jury.[5] *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The trial court did not err by permitting the jury to view the properly admitted exhibit in the jury room during deliberation.

*D. Failure to Grant Mistrial*

---

[5] We are aware that after the trial in this matter, the Tennessee Supreme Court decided in *Davidson* that "when a jury requests to view or hear evidence that cannot be appropriately examined in the jury room, the trial court should bring the jury into the courtroom with the parties and counsel present to view the evidence." 509 S.W.3d at 204. In this case, the jury viewed the videotape in the courtroom where the equipment was located, albeit without the presence of counsel or the parties. The in-court officer was the only person present other than the jury. There was no objection made to this procedure by Defendant. Additionally, the in-court officer testified that he did not hear deliberations and merely operated the equipment so that the jury could view the videotape. Thus, any error in this procedure was harmless.

- 20 -

Though not addressed separately, Defendant argues tangentially that the trial court erred in refusing to grant a mistrial after permitting the jury to review the tape despite its malfunction. Defendant insists that the malfunctioning of the videotape led to a manifest necessity for a mistrial. The State, on the other hand, insists that a mistrial was not the proper remedy.

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. *State v. Brown*, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000). A mistrial is an appropriate remedy when the trial cannot continue or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The party seeking the mistrial has the burden of establishing the necessity for it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

We have already determined that the videotape statement was properly admitted into evidence, that the trial court did not err by permitting the jury to view the tape multiple times, and that the trial court properly issued a curative jury instruction to deal with the allegedly malfunctioning videotape. Defendant has failed to establish that a mistrial was necessary. The trial court did not abuse its discretion in refusing to grant a mistrial. Defendant is not entitled to relief on this issue.

*VI. Denial of Mistrial After Improper Jury Conduct*

Defendant insists that he was prejudiced because the jury engaged in deliberations prior to being instructed to do so by the trial court. To support his argument, Defendant points to the fact that the jury retired to deliberate and almost immediately asked to see the videotaped statement. Defendant insists that the jury asked to see the videotape prior to electing a foreman. Defendant argues that the prejudice arose because the trial court did not hold a hearing to determine whether there was actual jury misconduct. Defendant also insists that court personnel influenced the jury verdict because they were present during deliberations to monitor the playback of the videotape of Defendant's statement. The State disagrees.

Under both the Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution, every criminal defendant has the right to a trial by an impartial jury. *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012)). "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *Id.* (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). If the jury has been exposed to extraneous

prejudicial information or subjected to an improper outside influence, the validity of the verdict is questionable and a new trial may be warranted. *Id.* (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)).

"A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id.* at 651 (citing *Caldararo*, 794 S.W.2d at 740-41). Once such a showing has been made, "a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Id.* (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). Whether the constitutional right to an impartial jury has been violated is a mixed question of law and fact which we review de novo, granting a presumption of correctness only to the trial court's findings of fact. *Id.* at 656 (citing *Fields*, 40 S.W.3d at 458).

"[A] defendant is entitled to a fair trial, not a perfect trial, and our ultimate inquiry is whether the jury that tried the case was actually fair and impartial." *State v. Leath*, 461 S.W.3d 73, 110-11 (Tenn. Crim. App. 2013) (internal quotation omitted). "It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Thus, it would be unreasonable, and perhaps unwise, to expect juries to be completely sterilized and free of any external influences." *Caldararo*, 794 S.W.2d at 743-44 (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Thus, our courts have generally defined extraneous prejudicial information as information "coming from without," or more specifically as "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Adams*, 405 S.W.3d at 650 (citations omitted). Similarly, an improper outside influence has been defined as "any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Id.* at 650-51 (internal quotation omitted). These categories "often overlap" and may be considered together. Neil P. Cohen et. al., *Tennessee Law of Evidence* § 6.06[6], at 6-54 (5th ed. 2005) (citing *Blackwell*, 664 S.W.2d at 688-89). However, Tennessee courts have drawn a "distinction between extrinsic and intrinsic influence" on the jury. *Caldararo*, 794 S.W.2d at 742. "External influences that could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial, (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case." *Id.* (citations omitted). On the other hand, internal influences such as "(1) discussions among jurors, (2) intimidation or harassment of one juror by another, (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions" are not reason enough for a new trial. *Id.* (citations omitted).

Tennessee Rule of Evidence 606(b) provides clear guidance on the type of evidence that is admissible when challenging a jury's verdict:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

"The rule precludes inquiries into the jury's deliberative process while allowing juror testimony concerning objective incidents or events that constitute external or extraneous influences on the jury." *Caldararo*, 794 S.W.2d at 742. In other words, "a juror may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Walsh*, 166 S.W.3d at 649 (internal quotation omitted). The rationale behind this rule has been explained as follows:

> [Rule] 606(b) represents a compromise between important public policies. It enables the courts to protect the litigants from verdicts tainted by extraneous prejudicial information or outside influence. At the same time, it recognizes the importance of the inviolate nature of a jury's deliberations . . . . Thus, it insures that jurors will not be guarded in their deliberations for fear of later scrutiny by others. It also prevents jurors whose views are in the minority from manipulating the system by repudiating the verdict and thereby requiring a new trial.

*Caldararo*, 794 S.W.2d at 741-42; *see also Carruthers v. State*, 145 S.W.3d 85, 92-93 (Tenn. Crim. App. 2003) (noting that the public policy considerations behind Rule 606(b) "include the prevention of jury harassment, encouragement of free and open jury deliberation, promotion of finality of verdicts, and the reduction of the incentive for jury tampering").

As an initial matter, Defendant has failed to produce any evidence to make the initial showing that the jury was exposed to extraneous prejudicial information or

- 23 -

subjected to an improper outside influence. *See Adams*, 405 S.W.3d at 651. The record reflects that the jury was sent to deliberate at 3:10 p.m. Soon thereafter, the in-court officer reported that the jurors requested to see the videotaped statement. The jury returned to the courtroom at 3:12 p.m. At the hearing on the motion for new trial, Deputy Davenport opined that it was impossible for the jury to elect a foreman between 3:10 and 3:12 p.m. Chief Deputy Eugene Roberts recalled that the jury room door did not even fully shut prior to the jury making the request to see the videotape. However, Chief Roberts thought that the request was made by Tony Collins, the foreman of the jury. Mr. Collins testified that he could not recall how long after they retired that he was elected foreman. At least three other jurors, including Martha Holiday, Tina Grisham, and Ricky Brown, testified at the hearing on the motion for new trial and confirmed that the jury elected the foreman soon after retiring to deliberate. There was no testimony at the hearing that the jurors were exposed to any outside influence or extraneous prejudicial information or that the jury began deliberations before directed to do so. The trial court specifically credited the testimony of the court officer, the deputy clerk, and the jurors in this regard. The trial court determined that there was no proof of juror misconduct or improper deliberation, finding that Deputy Davenport "had no discussions with the jury other than playing the videotape at the jury's direction" as instructed by the trial court. Defendant did not establish an improper outside influence which would raise a presumption of prejudice; thus, the burden never shifted to the State to rebut such a presumption. *Adams*, 405 S.W.3d at 651. Defendant is not entitled to relief on this issue.

## *VII. Newly Discovered Evidence*

Defendant argues that the victim's impact statement in the presentence report completely contradicts the victim's trial testimony and qualifies as newly-discovered evidence that would warrant a new trial. Without explaining the contradiction, Defendant insists that he is entitled to a new trial.

At trial, the victim testified that he was sitting around the campfire when Defendant attacked him. The victim testified that he could not recall stating to a psychiatrist that Defendant "touched his head," which made him angry and led to a fight. The victim could not recall Defendant "touching" him on the night of the incident. In the presentence report, the victim impact statement, completed by the victim, described the incident as follows:

> I was around a camp fire drinking a beer waiting on my friends to get back from the store when [Defendant] came up to me the first time [and] played with my hair[.] I didn't think anything of it [and] went back to drinking beer. [Defendant] came up a second time and cut my throat.

When a defendant seeks relief in a motion for a new trial based upon newly discovered evidence, the defendant must show that he exercised "reasonable diligence in seeking the newly discovered evidence," that the evidence is material, and "that the evidence will likely change the result of the trial." *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994); *see State v. Goswick*, 656 S.W.2d 355, 358-60 (Tenn. 1983). Generally, evidence that only "contradicts or attempts to impeach" witness testimony is insufficient to entitle a defendant to a new trial. *State v. Sheffield*, 676 S.W.2d 542, 554 (Tenn. 1984). Nevertheless, a trial court may grant a request for a new trial "if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal." *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993). The decision to grant or to deny a motion for a new trial on the basis of newly discovered evidence is "within the sound discretion of the trial court." *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967)).

We determine that the trial court did not abuse its discretion in refusing to grant a new trial on the basis of newly discovered evidence. The victim was impeached at trial when he failed to recall that he had made statements to a psychiatrist about Defendant touching his hair prior to the attack. The victim's impact statement was consistent with the statements made to the psychiatrist, thus it was not new evidence. Moreover, the evidence, if considered impeaching, was not so crucial that it would probably result in an acquittal. *Singleton*, 853 S.W.2d at 496. Defendant is not entitled to relief on this issue.

### VIII. Jury Instructions

Defendant argues that the trial court erred by giving the jury an instruction on flight where the proof did not support the instruction. The State insists that the facts at trial supported the instruction.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *Hodges*, 944 S.W.2d at 352. A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *Smiley*, 38 S.W.3d at 524.

The trial court provided the jury with the following jury instruction on flight:

> The flight of a person accused of a crime is a circumstance which when considered with all the facts of the case may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving the community for parts unknown to constitute flight.

> If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered, or by the facts and circumstances of the case.

> Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence exists supporting a jury instruction on flight where there is evidence of both a leaving the scene of the crime and subsequently hiding in the community. *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998). The State may satisfy the subsequent hiding requirement by presenting proof from which a jury might infer that the defendant committed this act. *State v. Terrance Wilks*, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999), *no perm. app. filed*. Even a brief evasion of authorities can support the giving of the flight instruction. *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989).

We conclude that the trial court properly instructed the jury as to the flight. The evidence at trial showed that Defendant cut the victim then left the fire, walked to his house, grabbed his coat and his medicine, and hid out in the woods and barn until after

- 26 -

the ambulance took the victim from the scene. While Defendant eventually surrendered to police, the evidence is sufficient to support the flight instruction because it shows that Defendant left the scene of the crime and hid to avoid being arrested for this crime. Accordingly, the trial court did not err in instructing the jury on flight. Defendant is not entitled to relief as to this issue.

*IX.  Denial of Motion for Judgment of Acquittal/Sufficiency of the Evidence*

Defendant alleges that the trial court erred in denying the motion for judgment of acquittal both at the conclusion of the State's proof and at the conclusion of the proof at trial. Defendant also claims that the evidence is insufficient to support the conviction for attempted second degree murder. Specifically, Defendant insists that "[a]ll credible facts set forth in the record support [Defendant's] version of the events at issue and not that of [the victim]."

Because "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof, is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction," we will resolve both Defendant's challenge to the denial of the motion for judgment of acquittal and sufficiency of the evidence together. *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or

circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of attempted second degree murder. Second degree murder is defined as the "knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Criminal attempt requires a defendant to act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believe[] the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2).

Viewed in the light most favorable to the State, the proof showed that Defendant approached the unarmed victim from behind and cut his throat from ear to ear. Judith Brown came outside when she saw Defendant and the victim struggling and separated the two men. The victim ran to Judith Brown's house, where he collapsed. He was flown to Nashville based on the severity of his injuries. During his statement, Defendant claimed that he "cut the fat piece of shit" for throwing bottles at "old people." Defendant told police that the victim did not try to attack him. However, at trial, Defendant claimed self-defense, insisting that the victim came at him with a machete. Defendant also points to inconsistencies between the victim's testimony at trial, where he alleged Defendant attacked him with no warning, and the victim's statements to psychiatrists at Vanderbilt, where he alleged that Defendant touched his hair to start the incident, to support his argument that the evidence was insufficient. Nevertheless, the jury chose to accredit the victim's version of events. As we have reiterated time and time again, the determination of issues of witness credibility and the resolution of conflicts in testimony rest squarely within the province of the jury. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this issue.

## X. Sentencing

Defendant complains that his sentence is illegal because it was excessive and because he did not receive probation. Defendant cites Tennessee Rule of Criminal Procedure 36.1 to support his argument. The State claims that Defendant waived the issue for failure to include a copy of the transcript from the sentencing hearing in the record. However, the trial court supplemented the record with two transcripts from the sentencing hearing. Therefore, we will consider the sentencing issue.

### A. Length

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sent. Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. § 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial and we will not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

At the sentencing hearing, the victim testified at length as to his continued health issues as a result of his injury. The victim testified that he had constant numbness in his face and neck along with a large scar that spanned from one ear to the other. The victim claimed that his injury forced him to quit at least one job and hampered his ability to secure additional employment. The victim acknowledged his past drug and alcohol problems but explained that he had been sober since the night of the incident.

Defendant's sister testified as to his "peaceful" nature. Defendant's fiancée Jacqueline Atwood testified that Defendant was "compassionate, funny, kind, and caring." Defendant relayed his numerous health issues to the trial court, including the fact that he had a knee replacement and was injured in a car accident when he was "really young." Defendant informed the trial court that he had a pretty complete employment history. Defendant acknowledged that he had a cocaine possession charge in California in 1993 but stated that he had not used drugs since completing a "challenge" program in 1997. Defendant did not express remorse for his actions, maintaining that he and the victim argued after Defendant touched the victim's hair and the victim said something about Defendant's wife.

The trial court discussed the mitigating factors proposed by Defendant and the enhancement factors proposed by the State. The trial court determined that there were not "any mitigating or enhancing factors that apply given the facts in this case." The trial court found Defendant was a Range I, standard offender and imposed a sentence of ten years, which is within the appropriate range and is presumed reasonable. *See* T.C.A. § 40-35-112(a)(2) (listing sentencing range of "not less than eight (8) nor more than twelve (12) years" for a Class B felony). The trial court discussed the average sentence of all "B felony" offenses and sentenced Defendant to a mid-range sentence of ten years.

Other than complaining about the fact that his sentence was "not in accordance with the applicable sentencing statutes" and "excessive," Defendant has not shown that the trial court abused its discretion in sentencing him to an effective sentence of ten years. Defendant is not entitled to relief on this issue.

### B. Probation

Defendant was eligible for probation on his attempted second degree murder conviction because the trial court imposed a sentence of ten years or less. *See* T.C.A. § 40-35-303(a). Attempted second degree murder, however, is a Class B felony, *see* T.C.A. §§ 39-13-210(c), 39-12-107(a), so Defendant was not considered a favorable candidate for probation. *See* T.C.A. § 40-35-102(6) (providing that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary"). Moreover, no criminal defendant is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). Instead, the defendant bears the burden of proving his or her suitability for alternative sentencing options. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-303(b)). To do so, the defendant must show the alternative sentencing option imposed "will subserve the ends of justice and the best interests of both the public and the

defendant." *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956), *overruled on other grounds, State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000).

Further, "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration." T.C.A. § 40-35-102(5). Before imposing a sentence of full confinement, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C). Our Supreme Court has noted that:

> Actions that are the result of intentional, knowing, or reckless behavior . . . are probably more deterrable than those which are not the result of a conscience effort to break the law. Indeed, this is the very rationale that underlies the deterrence aspect of punitive damages in tort law. *See Hodges v. S.W. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Common sense tells us that we may have less ability to deter crimes which are the result of provocation, sudden and extreme passion, or even negligent behavior, irrespective of whether others who commit similar crimes are incarcerated or given probation.

*State v. Hooper*, 29 S.W.3d 1, 11 (Tenn. 2000). In addition, the sentence imposed should be (1) "no greater than that deserved for the offense committed," and (2) "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). The party appealing a sentence bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401, Sent. Comm'n Cmts. Again, we review a trial court's sentencing determinations, including a denial of probation or another alternative sentence, under an abuse of discretion standard, and grant a presumption of reasonableness to within-range sentences reflecting an appropriate application of the purposes and principles of the Sentencing Act. *Caudle*, 388 S.W.3d at 278-79.

"If the seriousness of the offense forms the basis for the denial of alternative sentencing, Tennessee courts have held that the circumstances of the offense as

committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006) (quotations omitted). Our Supreme Court recently addressed the propriety of denying probation based on the seriousness of the offense in *State v. Trent*, 533 S.W.3d 282, 292-93 (Tenn. 2017). When doing so, the court noted "a trial court may not consider factors that constitute elements of the offense in determining whether the circumstances of an offense are sufficient to deny an alternative sentence." *Id.* at 293 (citation and internal quotations omitted). Therefore, when denying probation on the sole basis of the offense itself, "*the circumstances of the offense as particularly committed in the case under consideration* must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense." *Id.* at 292-93. This necessarily requires the trial court to examine and make findings regarding the particular circumstances surrounding the defendant's commission of the convicted offenses.

At the hearing, the trial court went on to deny probation in order to avoid depreciating the seriousness of the offense. The trial court acknowledged that Defendant "might be able to successfully complete a probationary sentence" but noted that "[l]ife [was] tough enough [for the victim] without having the added insult of having a so[-]called Columbian necktie scar around your neck." The trial court ultimately determined that the "seriousness of the offense overrides any and all potential that [Defendant] might have to serve this sentence on probation." When doing so, the trial court found any factors supporting the appropriateness of probation were heavily outweighed by the facts and circumstances surrounding the offense and the nature of the criminal conduct, which included the severity and brutality of the victim's injury.

The trial court did not base its denial of probation for the attempted second degree murder conviction solely on the elements of that offense. Instead, the trial court denied the defendant probation to avoid depreciating the seriousness of offense and to provide effective deterrence to others likely to commit similar offenses. In the course of its ruling, the trial court properly examined and made findings regarding the egregious circumstances of the crimes. "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (per curiam). Based on our review of the record, the victim suffered a life threatening injury, had to be flown to Nashville for treatment, and experienced continued health problems as a result of his injury. Consideration as to whether confinement is necessary to avoid depreciating the seriousness of the offense and/or particularly suited to provide effective deterrence to others likely to commit similar offenses are valid

considerations under Tennessee Code Annotated section 40-35-103.  Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

TIMOTHY L. EASTER, JUDGE